FILED
CLERK, U.S. DISTRICT COURT
3/2/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: CD DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COLE MATTHEW HARRIS,<br>ROBERT DOUGLAS SPIRO, JR.,<br>CINDY CHEN,<br>aka "Meila Chen,"<br>aka "Ying Chen," and<br>YAO LU,<br><br>Defendants. | CR 2:23-cr-00095-FMO<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 982: Criminal Forfeiture] |

The Grand Jury charges:

[18 U.S.C. § 1349]

[ALL DEFENDANTS]

A. INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

THE DEFENDANTS

1. Defendant COLE HARRIS was a resident of San Marino, California. Defendant HARRIS purported to be an officer of a California company called Capital Stone Holdings, Inc. ("Capital

Stone").

2. Defendant ROBERT DOUGLAS SPIRO, JR. was a resident of Valley Village, California. Defendant SPIRO purported to be an officer of Capital Stone.

3. Defendant CINDY CHEN, also known as ("aka") "Meila Chen," aka "Ying Chen," was a resident of San Marino, California, and resided with defendant HARRIS.

4. Defendant YAO LU was a resident of Los Angeles, California. Defendant LU purported to be an employee of Capital Stone.

THE PAYCHECK PROTECTION PROGRAM

5. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic. One form of assistance provided by the CARES Act was the authorization of United States taxpayer funded forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

6. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was

also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

7. A business's PPP loan application was received and processed, in the first instance, by a participating financial institution approved by the United States Small Business Administration ("SBA"). If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies. The SBA guaranteed the loans funded under the PPP.

8. PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds towards payroll expenses.

9. The PPP also allowed certain eligible borrowers that had previously received a PPP loan to apply for a second PPP loan, with the same general loan terms as their first PPP loan. These "second-round" loans could be used for the same purposes as were permitted for the first PPP loans, including payroll costs, interest on mortgages, rent, and utilities.

//

BANK 1

10. Bank 1 was a financial institution within the meaning of 18 U.S.C. § 20 that was an approved SBA lender of PPP loans.

B. THE OBJECT OF THE CONSPIRACY

11. Beginning in or around March 2020 and continuing until at least in or around September 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendants HARRIS, SPIRO, CHEN, and LU conspired with one another and with others known and unknown to the Grand Jury to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C. THE MANNER AND MEANS OF THE CONSPIRACY

12. The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

a. Defendants HARRIS, SPIRO, CHEN, and LU, together with other co-conspirators, would submit and cause to be submitted online applications for PPP loans on behalf of inactive companies through an approved SBA lender, with the intent to later apply to the SBA for forgiveness of the PPP loans.

b. Defendants HARRIS, SPIRO, CHEN, and LU, together with other co-conspirators, would knowingly make and cause to be made false statements in connection with the applications for PPP loans, including false statements about: (i) the number of employees at the companies; (ii) the amount of average monthly payroll for those employees; (iii) the truth and accuracy of all the information and documents submitted in or with the applications, including attached Internal Revenue Service ("IRS") forms; and (iv) the intended use of the loan proceeds, including false certifications that the loan proceeds would be used for permissible business purposes.

c. After the approved SBA lender funded the applied-for PPP loans, defendants HARRIS, SPIRO, and CHEN, together with other co-conspirators, would transfer and cause to be transferred the proceeds of the fraudulently obtained loans via wire transfers and checks to accounts that they controlled and other recipients for purposes that were not permitted under the PPP.

d. Defendants HARRIS, SPIRO, and CHEN, together with other co-conspirators, would use the fraudulently obtained PPP loan proceeds for non-business expenditures not permitted under the PPP.

e. Defendant HARRIS would apply for forgiveness a PPP loan, falsely representing in the forgiveness application that PPP funds had been spent consistent with the program's requirements.

D. OVERT ACTS

13. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants HARRIS, SPIRO, CHEN, and LU, together with other co-conspirators, committed and willfully caused others to commit the following overt acts, among others, in Los Angeles County, within the Central District of California, and elsewhere:

Deja, LLC

Overt Act No. 1: On or about March 27, 2020, communicating via the WeChat messaging application, defendants HARRIS and CHEN agreed that they should apply for PPP loans for multiple companies in order to fraudulently obtain millions of dollars.

Overt Act No. 2: On or about April 28, 2020, on behalf of Deja, LLC ("Deja"), defendant HARRIS submitted to Bank 1 a PPP Borrower Application Form (the "Deja Application"), which (i) falsely represented that Deja had 306 employees and an average monthly

payroll of $1,041,737; (ii) included supporting documents, including federal tax forms, that were false and fraudulent; (iii) falsely certified that the applicant would use the loan proceeds only for permissible business purposes; and (iv) falsely certified that all information submitted in or with the loan application was true and accurate.

Overt Act No. 3: On or about May 8, 2020, defendant HARRIS sent an email to an employee at Bank 1, which stated, in part: "Thank you for all your help getting this approved. Yao asked me to send you more information on the Deja, LLC. . . . We have approx. 300 employees that work in hospital, SNF, urgent care, occupational therapy and specialty care settings. . . . You can get more information on the company's website www.Dejastaff.com and if anyone has more questions they can call me directly anytime."

Overt Act No. 4: On or about May 8, 2020, after defendant HARRIS, in a communication via the WhatsApp messaging application, sent defendant SPIRO an image of the email that defendant HARRIS had sent to the employee at Bank 1, defendant SPIRO replied: "Perfect."

Overt Act No. 5: On or about May 12, 2020, after Bank 1 deposited approximately $2,604,300 of PPP loan proceeds into a Bank 1 account ending in 8951 in the name of Deja (the "Deja Bank 1 Account") for which defendant HARRIS was the sole signer, defendant CHEN, in WeChat communications, asked defendant HARRIS if he could deposit a $120,000 check for Capital Stone.

Overt Act No. 6: On or about May 13, 2020, defendant HARRIS signed a check in the amount of $120,000 payable to Capital Stone, which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account to a Wells Fargo Bank account ending in 9955 in the

name of Capital Stone (the "Capital Stone Wells Fargo Account"), for which defendant HARRIS was the sole authorized signer.

Overt Act No. 7: On or about May 14, 2020, defendant HARRIS initiated a wire transfer of $800,000 of PPP loan proceeds from the Deja Bank 1 Account to a Wells Fargo Bank account ending in 3819 in the name of Deja (the "Deja Wells Fargo Account"), for which defendant HARRIS was the sole authorized signer.

Overt Act No. 8: On or about May 14, 2020, defendant HARRIS withdrew $709,000 from the Deja Wells Fargo Account.

Overt Act No. 9: On or about May 14, 2020, defendant HARRIS signed a check in the amount of $100,000 payable to X.Z., which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account.

Overt Act No. 10: On or about May 14, 2020, defendant HARRIS signed a check in the amount of $53,500 payable to F.W., which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account.

Overt Act No. 11: On or about May 18, 2020, defendant HARRIS initiated a wire transfer of $600,000 of PPP loan proceeds from the Deja Bank 1 Account to the Deja Wells Fargo Account.

Overt Act No. 12: On or about May 18, 2020, defendant HARRIS withdrew $300,000 from the Deja Wells Fargo Account.

Overt Act No. 13: On or about May 19, 2020, defendant HARRIS withdrew $200,000 from the Deja Wells Fargo Account.

Overt Act No. 14: On or about May 20, 2020, defendant HARRIS withdrew $50,000 from the Deja Wells Fargo Account.

//

//

Overt Act No. 15: On or about May 22, 2020, defendant HARRIS withdrew $8,000 from the Deja Wells Fargo Account.

Overt Act No. 16: On or about May 26, 2020, defendant HARRIS withdrew $9,000 from the Deja Wells Fargo Account.

Overt Act No. 17: On or about June 3, 2020, defendant HARRIS withdrew $5,000 from the Deja Wells Fargo Account.

Overt Act No. 18: On or about June 3, 2020, defendant HARRIS signed a check in the amount of $600,000 payable to Deja and deposited the check, which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account to the Deja Wells Fargo Account.

Overt Act No. 19: On or about June 11, 2020, defendant HARRIS initiated a wire transfer of $350,000 of PPP loan proceeds from the Deja Wells Fargo Account to the Capital Stone Wells Fargo Account.

Overt Act No. 20: On or about June 12, 2020, defendant HARRIS signed a check in the amount of $20,000 payable to F.Z., which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account.

Overt Act No. 21: On or about June 18, 2020, defendant HARRIS withdrew $9,000 from the Deja Wells Fargo Account.

Overt Act No. 22: On or about June 19, 2020, defendant HARRIS, sent a wire transfer of $200,000 of PPP loan proceeds from the Deja Wells Fargo Account to a Citibank account ending in 2201 in the name of Capital Stone.

Overt Act No. 23: On or about August 5, 2020, defendant HARRIS initiated a wire transfer of $40,000 of PPP loan proceeds from the Deja Wells Fargo Account to a Citibank account ending in 2201 in the name of defendant HARRIS.

Overt Act No. 24: On or about October 1, 2020, defendant HARRIS signed a check in the amount of $20,000 payable to X.L., which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account.

Overt Act No. 25: On or about October 6, 2020, defendant HARRIS signed a check in the amount of $45,955 payable to H.B., which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account.

Overt Act No. 26: On or about October 19, 2020, defendant HARRIS signed a check in the amount of $15,000 payable to Z.L., which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account.

Overt Act No. 27: On or about October 13, 2021, defendant HARRIS signed a check in the amount of $45,000 payable to Deja, which resulted in the transfer of PPP loan proceeds from the Deja Bank 1 Account.

Overt Act No. 28: On or about October 20, 2021, defendant HARRIS withdrew $40,000 from the Deja Wells Fargo Account.

Overt Act No. 29: On or about November 4, 2021, defendant HARRIS withdrew $5,000 from the Deja Wells Fargo Account.

Overt Act No. 30: On January 18, 2022, defendant HARRIS submitted to Bank 1 a fraudulent PPP Loan Forgiveness Application Form (the "Deja Forgiveness Application"), which falsely represented, among other things, that: (1) Deja had 306 employees at the time of the Deja Application; (2) the dollar amount for which forgiveness was requested "was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility

payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures)[,]" and caused the electronic transfer of money in the custody and control of the SBA to Bank 1 on or about September 15, 2022.

Emergency Response Nursing, LLC

Overt Act No. 31: On or about July 31, 2020, in a WeChat communication, defendant LU sent defendant SPIRO a PDF titled "Citi_Small_Business_Loan_Application_2483_Doc.pdf," which was a PPP Borrower Application Form that was purportedly electronically signed by J.L. on behalf of ERN on or about July 31, 2020, which (i) represented that J.L. was the "Chief Executive Officer" of ERN and owned 100 percent of ERN; and (ii) falsely represented that ERN had 137 employees and an average monthly payroll of $397,281; and (iii) listed an email address that consisted of J.L.'s last name, J.L.'s first name, and some numbers (the "J.L. Email Address").

Overt Act No. 32: On or about September 25, 2020, in a WeChat group chat in which defendants HARRIS, SPIRO, CHEN, and LU were participants, after defendant CHEN sent a message asking, "Yao, which email did you use for er nursing[,]" defendant LU logged into the J.L. Email Address, told the group that the lender needed a "tax return, bank statements, and a voided check[,]" and told the group that he was going to "make" the fake files.

Overt Act No. 33: On or about January 16, 2021, defendant CHEN, in a WeChat communication, sent defendant HARRIS a message stating: "Emergency response nursing llc[.] 1055 E. Colorado blvd suite500 pasadena ca 91106[.]"

//

Overt Act No. 34: On or about January 20, 2021, after defendant SPIRO, in a text message, asked defendant CHEN, "Can you screen shot the 941 & the payroll report for me[,]" defendant CHEN sent an image of a Form 941 for ERN for the second quarter of 2019 that falsely represented that: (1) ERN had 145 employees; and (2) ERN paid quarterly "[w]ages, tips, and other compensation" of $1,205,842.22.

Overt Act No. 35: On or about February 2, 2021, on behalf of ERN, defendant CHEN or an unidentified co-conspirator, submitted to Bank 1 a PPP Borrower Application Form (the "ERN Application") that was purportedly electronically signed by "Jin Lie," which: (i) falsely represented that ERN had 268 employees and an average monthly payroll of $460,329; (ii) included supporting documents, including federal tax forms, that were false and fraudulent; (iii) falsely certified that the applicant would use the loan proceeds only for permissible business purposes; (iv) falsely certified that all information submitted in or with the loan application was true and accurate; and (v) represented that J.L. was a "Managing Member" who owned 88 percent of ERN.

Overt Act No. 36: On or about February 2, 2021, after defendant CHEN sent defendant SPIRO a text message stating, "docusigned for" Bank 1, defendant SPIRO replied: "What was the final loan amount?"

Overt Act No. 37: On or about February 10, 2021, via text messages, defendant CHEN told defendant SPIRO that they needed to pay "a little" to J.L., the "guy" on "the ERN[.]"

Overt Act No. 38: On or about February 24, 2021, in a text message conversation, after defendant CHEN asked defendant SPIRO,

"Can i wire to 116 guilden llc company[,]" defendant SPIRO replied, "I don't see why not[.]"

Overt Act No. 39: After Bank 1 deposited, on or about February 2, 2021, approximately $1,150,822 of PPP loan proceeds into a Bank 1 account ending in 8442 in the name of ERN (the "ERN Bank 1 Account") for which J.L. was the sole signer, defendant CHEN caused a wire transfer of $600,300 of PPP loan proceeds from the ERN Bank 1 Account to a JPMorgan Chase Bank with routing number 021000021, which is located in Ohio, specifically, to an account ending in 3598 in the name of 116 Guilden LLC (the "116 Guilden Account") on or about February 25, 2021.

Overt Act No. 40: On or about February 28, 2021, via text messages, defendant CHEN asked defendant SPIRO if they "can wire the rest" to "Vantage escrow inc[.]"

Overt Act No. 41: On or about March 3, 2021, defendant CHEN caused a wire transfer of $200,315.29 of PPP loan proceeds from the ERN Bank 1 Account to the 116 Guilden Account.

Overt Act No. 42: On or about March 10, 2021, after defendant CHEN, in a text message, asked defendant SPIRO, "Can we send the rest to vantage escrow company[,]" defendant SPIRO replied: "I don't see why not, but how will they send it back?"

Overt Act No. 43: On or about March 11, 2021, defendant CHEN caused a wire transfer of $300,356.20 of PPP loan proceeds from the ERN Bank 1 Account to an East West Bank account ending in 0055 in the name of Vantage Escrow Inc.

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of the conviction of defendants COLE MATTHEW HARRIS, ROBERT DOUGLAS SPIRO, JR., CINDY CHEN, or YAO LU of the offense set forth in the sole count of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/

Foreperson

E. MARTIN ESTRADA
United States Attorney

Scott M. Garringer
Deputy Chief, Criminal Division For:

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

SHAWN J. NELSON
Assistant United States Attorney
Chief, International Narcotics, Money Laundering, and Racketeering Section

CHRISTOPHER C. KENDALL
Assistant United States Attorney
Deputy Chief, International Narcotics, Money Laundering, and Racketeering Section

MIRI SONG
Assistant United States Attorney
International Narcotics, Money Laundering, and Racketeering Section

SKYLER F. CHO
Assistant United States Attorney
International Narcotics, Money Laundering, and Racketeering Section